IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                 Case No. 13-cr-2164 RB

LEROY B. MONTOYA,

     Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

This matter comes before the Court on Defendant's Motion for Suppression (*doc. 30*) which is fully briefed.  *See doc. 36*.  This motion was referred to me on August 13, 2013, and on August 20, 2013, I held a hearing.  *See docs. 37, 38, 39*.  Based on this record, I recommend the Court grant in part and deny in part Defendant's motion.

I.    FACTS

Based on the evidence presented by the parties at the hearing, the facts are as follows.[1]  In September 2012, Defendant Montoya was under surveillance by law enforcement agents assigned to a local gang task force.  On September 4, 2012, those agents observed Defendant in possession of a pistol that he was carrying in his

_____

[1] In addition to the testimony, the following exhibits were admitted and considered: (1) dash cam video; (2) photograph of SUV from perspective of rear driver's side; (3) photograph of SUV from perspective of front passenger side; (4) photograph of engine compartment; (5) close-up photograph of firearm as discovered in engine compartment; (6) photograph of firearm after removal from engine compartment; (7) "Consent to Search" form signed by Defendant; and (8) "Miranda Rights" form signed by Defendant at police station.

waistband.  The task force agents were also aware that Defendant had been previously convicted of a felony.  The next day, Defendant was driving a red older model Chevy Blazer sport utility vehicle (SUV).  Deputy Curtis Yarnell, a deputy with the Dona Ana Sheriff's Department and a member of the task force, was on duty.  Deputy Yarnell was contacted by other task force agents and asked to initiate a traffic stop on Defendant.  At that time, Deputy Yarnell was aware that Defendant had been observed carrying the pistol the day before.

Deputy Yarnell located Defendant's vehicle[2] as it was driving on Avenida de Mesilla in Las Cruces, New Mexico.  Dash cam Video (DCV) at 10:08:19.[3]  Deputy Yarnell observed that the SUV was carrying a long extended ladder on its rooftop.  Deputy Yarnell believed that the ladder extended at least four feet beyond the body of the vehicle which would require a red warning flag to be attached at the end.  The ladder being carried by Defendant's vehicle did not carry such a warning flag.  On the basis of this perceived traffic violation, Deputy Yarnell activated his warning lights signaling Defendant to pull over and stop.  Defendant did so and stopped in the parking lot of the Burger Time restaurant.  DCV at 10:08:41.

---

[2] The vehicle driven by Defendant was not registered to him and he denies ownership of it.  For the purposes of this motion, ownership is irrelevant.  When the Court refers to "Defendant's vehicle," it is only a reference to the vehicle being driven by Defendant.

[3] The Dashcam video from Deputy Yarnell's vehicle was admitted at the hearing as Exhibit 1.  While the camera shows the view out the vehicle's front window, the audio records only sounds inside the patrol vehicle.  Consequently, the specifics about the content of conversations outside the vehicle are based on the hearing testimony.

When the Defendant's vehicle came to a stop, Deputy Yarnell began to approach the driver's side of the SUV.  DCV at 10:08:54.  When he was still more than five feet behind the SUV, Deputy Yarnell observed movement in the driver's side view mirror.  DCV at 10:08:54-56.  The driver's window was down and Deputy Yarnell believed he saw the driver lean down toward the floorboard and make "furtive movements" with his hands.  Deputy Yarnell stopped approaching the vehicle and ordered the driver to show his hands.  Defendant complied and stuck his hands out the window.  DCV at 10:08:56-57.  Deputy Yarnell then resumed his approach, had Defendant exit the vehicle and commenced a pat-down of Defendant's person.  DCV at 10:08:58-09:30.  During the pat-down, Deputy Yarnell asked Defendant if he was carrying any weapons, knives or anything else that might injury Deputy Yarnell.  Defendant stated that he was carrying two pocket knives in his pocket and a syringe of heroin in his boot.  Deputy Yarnell located and removed these items from Defendant's person, and completes the pat-down.  DCV at 10:09:31-10:10:52.

After the pat-down, Deputy Yarnell walked Defendant over to the front of the patrol car and they spoke.  DCV at 10:10:53-10:13:06.  During this time, Defendant was not in handcuffs nor was he required to place his hands on the patrol car.  *Id*.  It is apparent from the video that the conversation was casual and cordial.  In this conversation, Deputy Yarnell told Defendant the reason for the stop, and asked if the vehicle contained anything illegal such as weapons or narcotics.  Defendant responded

3

that it did not.  Perhaps volunteered by Defendant or perhaps in response to Deputy

Yarnell's request, Defendant gave Deputy Yarnell permission to search the SUV..  DCV

at 10:12:05-08.  Deputy Yarnell then retrieved a written consent to search form from his

vehicle and filled out portions of the form, including the identification of the vehicle.

DCV at 10:13:07-10:14:39.  Deputy Yarnell then explained the form and handed it to

Defendant.  DCV at 10:14:40-10:14:51.  The form, which Defendant then signed, stated

that "I, Leroy Montoya, have given my permission for Deputy Yarnell … to search [the

SUV].  …  I understand my constitutional right not to have a search made of the …

property."  Hrg. Ex. 7; DCV at 10:14:52-59.  The form was written in English -- the same

language in which Defendant conversed with Deputy Yarnell throughout the traffic

stop.  The hearing testimony and the video firmly demonstrate Defendant understood

what was happening.

Until this time,[4] no other officers had been near or interacted with Defendant.

No firearms or handcuffs had been brandished.  Deputy Yarnell had interacted with

Defendant in a calm and friendly fashion.  No threats or promises had been made in

order to gain Defendant's consent.  The interactions occurred in a public parking lot

alongside a busy street in the middle of the morning.

After Defendant consented both verbally and in writing but before Deputy

Yarnell commenced the search, he directed Defendant to stand facing away from the

---

[4] At a later time while Deputy Yarnell is engaged in the search, Defendant does
speak with another officer.  DCV at 10:20:40.  This interaction is also friendly and casual.

SUV with his hands on the patrol car.  DCV at 10:15:06.  This location was approximately ten yards from the SUV.  Defendant was permitted to keep and use his mobile phone.  *See* DCV at 10:28:19-28.  Deputy Yarnell then approached the passenger side door to speak with the passenger.  Once Deputy Yarnell finished dealing with the passenger, the search began. DCV at 10:19:23.

About thirteen minutes after Defendant signed the consent form and nine minutes after the search had begun, Deputy Yarnell returned to speak with Defendant. DCV at 10:28:00.  As Deputy Yarnell testified, the morning was warm, and Defendant's standing position was directly in the sun.  Consequently, Deputy Yarnell asked if Defendant would prefer to sit on a rock which was in the shade of a tree nearby. Defendant indicated that he did and he moved to the new location.  The new location was within ear shot of ordinary conversation.  *See* DCV at 10:29:10-35 (Deputy Yarnell standing at rear of SUV talking with Defendant located off-screen in the shade).

After searching the cabin of the SUV, Deputy Yarnell and another officer who had arrived to assist with the search opened the hood of the SUV.  DCV at 10:39:46. When they did so, they immediately saw .45 pistol inside the engine compartment. Defendant was then placed under arrest for being a felon in possession of a firearm. After being handcuffed, Defendant was placed in the back of Deputy Yarnell's patrol car.[5]  DCV at 10:42:00.

---

[5] The passenger was also formally arrested at this time for outstanding warrants.

When Defendant was first placed in the patrol car, the following exchange

occured:

>Deputy Yarnell: Are you a prior felon?
>Defendant: Prior felon?
>DY:  Yeah
>Def:  Been a long time
>DY: Yeah, are you a felon though?
>Def: Been a long time.  I think like 20 years.
>DY: Really
>Def: Yeah.

DCV at 10:42:00-24.

Deputy Yarnell then returned to processing the scene with the other officers.

More than twenty minutes later, the officers are still processing the scene.  Throughout

this time, Defendant remained alone[6] in the back of Deputy Yarnell's patrol car.  The

patrol car was located such that Defendant could still observe all the activities of the

officers around his SUV.  At 11:04:11, the officers are standing right around the engine

compartment where the firearm is still located.  Apparently, they are about to pick up

the firearm.  Unsolicited, Defendant yells out, "Yeah, be careful with that; it's got one in

the chamber."  Deputy Yarnell then picks up the firearm and begins to walk back to his

patrol car and Defendant.  As he approaches the patrol car but before he can ask a

question, Defendant repeats, "Got one in the chamber."  DCV at 11:04:30.  The following

---

[6] The only exception is when Deputy Yarnell is asked by the manager of the
Burger Time to move his patrol vehicle.  In response, Deputy Yarnell moves his vehicle
a short distance with Defendant in the back seat.  However, no words are spoken
between them during that short time.

exchange then occured:

> DY:  Got one in the chamber?
> Def: Yeah, that's why I'm telling you to be careful, homes.
> DY:  Hey dude, why you scaring me like that?
> Def:  I'm just telling you. Letting you know, bro.  So you don't get yourselves…
> DY:  So we don't get ourselves hurt?
> Def:  I'm not trying to be an ass.
> DY:  No, no, no.  I appreciate that.  Thanks for the respect, man.  Really appreciate that.
> Def:  I don't want you guys to go get shot.
> DY:  Were you in the Air Force or Marines?
> Def:  It's a Marine gun.
> DY: Marine gun?
> Def:  Yeah.
> DY:  Were you in the Marines?
> Def:  Nah.
> DY: No?  It's a nice gun, man.
> Def: Yup.
> DY: Does it shoot pretty smooth?
> Def: Very smooth.
> DY: Yeah, yeah.  Thanks for the warning again.  I appreciate that.
> Def:  I'm sorry for …  I should have told you right away.
> DY: Uh, OK.
> Def:  Sorry, bro.  I mean… I don't want you to go get yourself shot … It go off or something.
> DY:  I appreciate it, sir.  No problem.

DCV at 11:05:22.

Sometime later, Defendant was transported to the police station, read

his *Miranda* rights, and gave a statement.[7]

---

[7] I do not construe the instant motion to seek suppression of the statements made at the station.  First, Defendant's motion does not describe what those statements might have been.  Second, only in one place in the body of the motion does Defendant identify the statements he seeks to suppress with any specificity.  He states that "all statements by Mr. Montoya made at the scene, must be suppressed."  *Doc. 30* at 5.  Thus, it would appear that he does not seek suppression of statements not made at the scene.  Third,

II.    ANALYSIS

A.    <u>**Traffic Stop**</u>

A traffic stop is a seizure for Fourth Amendment purposes and must be justified by reasonable articulable suspicion under the standards set forth in *Terry v. Ohio*, 392 U.S. 1 (1968).  A "traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has a reasonable suspicion that a traffic or equipment violation has occurred or is occurring."  *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995).  In the instant case, Deputy Yarnell testified that he believed that Defendant was committing an equipment violation.  Specifically, New Mexico traffic code requires that if "the load upon any vehicle extends to the rear four feet or more beyond the bed or body of such vehicle . . . there shall be displayed at the extreme rear end of such load a red flag or cloth . . . so hung that the [flag] is visible to the driver of a vehicle approaching from the rear."  N.M. Stat. Ann. § 66-3-824.  Deputy Yarnell concluded that the ladder on Defendant's vehicle extended at least four feet beyond the SUV's body such that it was required to be flagged.  Because no flag was present, he believed an equipment violation was occurring and signaled Defendant to pull over.  In his motion, Defendant contends that the ladder did not extend four feet

the evidence and argument presented at the hearing clearly demonstrated the parties' focus on the statements made at the scene.  If Defendant intended, or now intends, to seek suppression of the statements made at the station, I recommend he be permitted to file a second motion to suppress specifically raising that claim.

and, thus, there was no equipment violation.

As events transpired, the actual length the ladder extended beyond the back of the vehicle was never measured or otherwise conclusively determined. Nonetheless, there is evidence before the Court which bears on this fact. Of the greatest significance are the photos of Defendant's vehicle during the search. While none is directly side on, Exhibits 2 and 3 provide important information. *See also* DCV at 11:05:22. A review of these photographs together reveals that four rungs of the ladder hang completely off the back of the SUV. In the photo and video, the rungs of the ladder appear to be spaced 12 inches from each other. This distance would be consistent with most standard extension ladders. 29 C.F.R. § 1926.1053 (a)(3)(ii)(rungs of portable ladders must be spaced 12 inches apart +/- 2 inches). Therefore, these four rungs would represent 36 inches extending from the back of the SUV. In addition, the length of the ladder below the bottom rung is about 6 inches. Finally, the length of ladder from the back edge of the SUV to the first rung seen hanging off is approximately six inches. In total then, the ladder hangs off the back of the SUV almost exactly four feet. At four feet, the ladder must be flagged and Defendant's was not. Moreover, even if the length of ladder hanging off is slightly less than four feet, this fact would not render the traffic stop improper. "An officer's reasonable mistake of fact, as distinguished from a mistake of law, may support the probable cause or reasonable suspicion necessary to justify a traffic stop." *United States v. DeGasso*, 369 F.3d 1139, 1144 (10th Cir. 2004). Given that

the extension of the ladder beyond the SUV was so close to four feet and obviously not flagged, Deputy Yarnell possessed sufficient reasonable suspicion of an equipment violation to justify the traffic stop.[8]

Defendant correctly points out that Deputy Yarnell was subjectively motivated to make the stop, not due to the equipment violation, but because the task force wanted him stopped.  However, as Defendant conceded at the hearing, the "constitutional reasonableness of traffic stops [do not] depend[] on the actual motivations of the individual officers involved."  *Whren v. United States*, 517 U.S. 806, 813 (1996). Therefore, the fact that the equipment violation stop was pretextual is irrelevant given that there was reasonable suspicion that an equipment violation was occurring.

When Defendant pulled over into the parking lot, Deputy Yarnell exited his patrol car and began approaching Defendant's vehicle.  In Defendant's motion, he contends that "[o]nce Officer Yarnell had actually stopped Montoya's vehicle, he could see that the ladder did not extend 4 feet from the rear of the vehicle.  This was evident before he made actual contact with Mr. Montoya.  Reasonable suspicion dissipated, and the resulting detention of Mr. Montoya was … unlawful."  *Doc. 30* at 3-4.

Indeed, if Deputy Yarnell immediately and conclusively observed that the ladder extended short of four feet before he approached Defendant, prolonging the detention

---

[8] Because I conclude that there was reasonable suspicion that N.M. Stat. Ann. § 66-3-824 was being violated by Defendant, there is no need to determine whether the same facts would support reasonable suspicion that N.M. Stat. Ann. § 66-3-801 was also violated.  *See doc. 36* at 2, n.2.

may have violated the Fourth Amendment.  *See e.g., United States v. McSwain*, 29 F.3d 558, 561 (10th Cir. 1994).  The instant case, though, played out very differently.  First, as noted above, I conclude that the ladder in fact extended approximately four feet beyond the body of the SUV.  Second, even if the ladder extension was just short of that length, Deputy Yarnell would have needed to closely measure it to make such a determination. He never had the chance.  Instead, while Deputy Yarnell was still more than five feet behind the SUV, he observed movement by the driver which included leaning down toward the floorboard.  Given that Deputy Yarnell was aware that Defendant was a felon who had been in possession of a firearm just the day before, it was entirely reasonable for him to (1) order Defendant to show his hands, and (2) order Defendant out of the vehicle, and (3) conduct a pat-down of Defendant.  *See United States v. Rice*, 483 F.3d 1079, 1082-84 (10th Cir. 2007).

Once Deputy Yarnell conducted the pat-down, he discovered that Defendant was in possession of a syringe containing heroin.  As such, he possessed probable cause to arrest him for possession of narcotics.  The fact that Deputy Yarnell did not place him under arrest at that time does not alter the fact that Defendant's further detention was constitutionally justified.

Nonetheless, the fact that the Defendant could be further detained does not *ipso facto* justify the search of the vehicle.  To justify the search, the government argues that Defendant voluntarily consented to it.  If the government seeks to validate a search

11

based on consent, the government bears the burden of proving that consent was freely

and voluntarily given.  *United States v. Sandoval*, 29 F.3d 537, 539 (10th Cir.1994). To

determine whether consent was voluntary, the Court evaluates the totality of the

circumstances.  *United States v. Santurio*, 29 F.3d 550, 552 (10th Cir.1994); *see United States*

*v. Mendenhall*, 446 U.S. 544, 557 (1980).  A person who is being detained may still give

voluntary consent.  *United States v. Flores*, 48 F.3d 467, 469 (10th Cir. 1995).  The Court

utilizes a two-part test to make this determination: "First, the government must proffer

'clear and positive testimony that consent was unequivocal and specific and freely

given.' Furthermore, the government must prove that this consent was given without

implied or express duress or coercion."  *United States v. McRae*, 81 F.3d 1528, 1537 (10th

Cir. 1996) (quoting *United States v. Angulo–Fernandez*, 53 F.3d 1177, 1180 (10th Cir.1995)).

The government has met its burden in this case.  As to the first prong, Defendant

consented both verbally and in writing.  There is no evidence that his verbal or written

consent was equivocal in any way.  Moreover, the consent was specific to a search of the

SUV.  As to the second prong – whether the consent was freely given or was the

product of duress or coercion – the evidence is overwhelming.  The following non-

exhaustive list clearly demonstrates that consent was freely given: (1) Deputy Yarnell

did not use aggressive language or tone of voice – in fact, his language and tone were

calm and conversational; (2) when Defendant verbally consented to the search, Deputy

Yarnell was not in possession of Defendant's driver's license or other identification;[9] (3) the stop was in full view of the public (public parking lot during midday); (4) when Defendant initially consented, only one other officer was present; and (5) until the firearm was located, Defendant was never handcuffed or otherwise restrained.  Aside from the mere fact that Defendant gave consent during a *Terry* stop, nothing points away from a finding of voluntary consent.

After Defendant consented both in writing and verbally, he never made any indication that he wished to revoke the consent.  He was always near the SUV while the search was ongoing.  In fact, Deputy Yarnell spoke to him several times during the search and Defendant never expressed a desire to end the search.  Throughout thisperiod, Deputy Yarnell acted courteously by allowing Defendant to move into the shade to sit down because the day was warm.  It is clear to me that Defendant's consent to the search continued to be voluntary through the discovery of the firearm.

Because the discovery of the firearm was the result of a proper traffic stop and a subsequent voluntary consensual search, there is no basis for its suppression.

### B.      Statements

It is the government's burden to show, by a preponderance of the evidence, that a confession was voluntary.  *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006).

---

[9] Deputy Yarnell did take Defendant's driver's license from Defendant after Defendant verbally consented, and used it to complete portions of the written consent form.  DCV at 10:12:05-10:14:51.

Moreover, if a suspect is in custody, a waiver of *Miranda* rights must be obtained prior to "custodial interrogation." *United States v. Perdue*, 8 F.3d 1455, 1464 (10th Cir. 1993).

      In the instant case, the statements made by Defendant at the scene can be placed in three different categories: (1) statements about his prior felony; (2) unsolicited statements about the firearm; and (3) solicited statements about the firearm.

      (1)    <u>Statements about prior felony</u>

      After the officers discovered the firearm, they immediately arrested Defendant. He was handcuffed and placed in the back of the patrol car.  At that point, Defendant was in custody.  However, the government presented no evidence that Defendant was read his *Miranda* rights at the scene.  Because it is the government's burden to show a waiver of those rights, I find no *Miranda* waiver by Defendant at the scene. Nonetheless, Deputy Yarnell conducted a short interrogation of Defendant immediately after placing Defendant in the patrol car regarding Defendant's criminal history. DCV at 10:42:00-24 ("DY: Are you a prior felon?  Def: Prior felon? DY:  Yeah. Def:  Been a long time. DY: Yeah, are you a felon though?  Def: Been a long time.  I think like 20 years. DY: Really. Def: Yeah." ).  Given that Defendant was in possession of a firearm, a prior felony conviction would mean Defendant was guilty of a crime.  As such, those questions were reasonably likely to elicit an incriminating response.  *See Rhode Island v. Innis*, 446 U.S. 291, 300-02 (1980).  Because Defendant was subjected to custodial interrogation and did not waive his *Miranda* rights, the questions and answers about

14

Defendant's prior felony should be suppressed.

(2)    Unsolicited Statements about the Firearm[10]

A waiver of *Miranda* rights is required only for statements made in response to interrogation.  Thus, voluntary and unsolicited statements are admissible even if made while in custody and without a *Miranda* advisement.  *See United States v. Muniz*, 1 F.3d 1018, 1012 (10th Cir. 1993).  In fact, statements made without *Miranda* warnings but not in response to police interrogation are admissible even though they followed an earlier voluntary statement made in violation of *Miranda*.  *United States v. Pettigrew*, 468 F.3d 626, 636 (10th Cir. 2006).  In such cases, even though the earlier statements are inadmissible, the unsolicited statement is admissible as long as it is knowingly and voluntarily made.  *Id*.

Defendant's first two statements informing the officers that the firearm was loaded were clearly unsolicited and voluntary.  No officers were around or otherwise interacting with Defendant.  The officers were focused on photographing the scene and collecting evidence.  Although Defendant was under arrest and in custody, no conduct by the officers compelled or coerced those two statements from him.  Because I find the statements unsolicited and voluntary, I recommend they not be suppressed.

---

[10] Specifically, I refer to where Defendant yells out unsolicited, "Yeah, be careful with that; it's got one in the chamber."  Deputy Yarnell then picks up the firearm and begins to walk back to his patrol car and Defendant.  As he approaches the patrol car but before he can ask a question, Defendant repeats, "Got one in the chamber."  DCV at 11:04:11-30.

(3)     Solicited Statements about Firearm

This category includes all questions and answers between Deputy Yarnell and

Defendant beginning from where Deputy Yarnell asked, "Got one in the chamber?"

DCV at 11:04:31-11:05:22.  Because these statements by Defendant were (a) in response

to Deputy Yarnell's questioning, (b) while Defendant was in custody, and (c) reasonably

likely to elicit incriminating responses, they would be admissible only if the

government established a knowing and voluntary waiver by Defendant of his *Miranda*

rights.[11]  Again, the government has presented no evidence of such a waiver, so these

statements should also be suppressed.

## III.   CONCLUSION

I conclude and recommend finding as follows:  The traffic stop of Defendant was

based on reasonable suspicion of a traffic violation.  Under the circumstances, Deputy

Yarnell properly conducted a pat-down search of Defendant and  discovered a syringe

of heroin on Defendant's person.  Defendant consented to a search of the SUV.  At the

time he consented, he was still properly detained.  His consent was freely given and not

the product of duress or coercion.  The discovery of the firearm was a product of this

consensual search.  Thus, I recommend denying the motion to suppress the firearm.  To

the extent that Defendant's motion to suppress his statements is based upon them being

---

[11] Arguably, some of Deputy Yarnell's initial questions could fall within the
public safety exception, but the government does not make that argument here.  *See e.g.*
*United States v. Jefferson*, 2008 WL 1848798 (M.D. Ala., Apr. 24, 2008).

the result of illegal detention, I recommend it be denied.

Nonetheless, as a result of the violation of Defendant's *Miranda* rights, I recommend suppressing Defendant's responses to the Deputy Yarnell's questions about his prior felony and about the firearm.  I recommend denying the suppression motion as to Defendant's unsolicited statements about the firearm.

GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**